UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| KASP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 05-394-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ADESA LEXINGTON, LLC, ADESA, | ) | **MEMORANDUM OPINION** |
| INC., and ALLETE, INC., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Defendants' motion to dismiss the Amended Complaint. [Record No. 21] Because Plaintiff KASP (KASP) has made sufficient allegations to sustain its claims under Sections 1 and 2 of the Sherman Act, its state law claims under the Kentucky Consumer Protection Act and its state law claims of tortious interference, the Court will deny the motion to dismiss as to these counts. However, KASP has not stated a claim under Section 3 of the Clayton Act, and has failed to make sufficient allegations to establish personal jurisdiction over Defendant ALLETE, Inc. (ALLETE). Accordingly, the Court will grant the Defendants' motion to dismiss the Clayton Act claim and will grant ALLETE's  motion to dismiss for lack of personal jurisdiction.

## I.      BACKGROUND

KASP is a Kentucky Corporation which conducts auto auctions and performs related services in central Kentucky.  It is the largest independent automobile auction company in

Kentucky and the second largest overall auto auction business in central Kentucky. Defendant ADESA Lexington, LLC (ADESA Lexington), is a direct competitor of KASP's auto auction division. ADESA Lexington is the largest auto auction in central Kentucky. This Defendant is wholly-owned by Defendant ADESA, Inc. which is, in turn, wholly-owned by ALLETE.

On July 19, 2005, KASP filed a Complaint in this Court alleging that ADESA Lexington was conducting business in violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and the Kentucky Consumer Protection Act. Additionally, KASP alleged that ADESA Lexington was tortiously interfering in its dealings with auto dealers with whom KASP had previously done business and/or with whom it sought to do business in the future.

KASP alleges that it learned, through the testimony of a former ADESA Lexington employee, of contracts which ADESA Lexington was entering with area auto dealers. These contracts offered a substantial discount on auctioneering services, provided the dealer would agree not to do business with KASP. KASP alleges that these contracts are in violation of federal and state anti-trust laws, and constitute tortious interference with its business under state law.

On October 31, 2005 KASP filed an Amended Complaint. The Defendants' joint motion to dismiss followed.

## II.    LEGAL STANDARD

-2-

The Defendants' motion to dismiss is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which allows a defendant to move for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. When analyzing the sufficiency of a complaint, the Court applies the principle that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996). Further, courts must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard*, 76 F.3d at 724 (quoting *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994)).

While a complaint need not specify every detail of a plaintiff's claim, it must give the defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gazette*, 41 F.3d at 1064. Although liberal, this standard of review requires more than the bare assertion of legal conclusions. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 346 (6th Cir. 2000) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)). "In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."

*Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis removed) (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)).

## III.   ANALYSIS

As noted above, in evaluating whether dismissal is proper under Rule 12, the Court must assume all allegations of the plaintiff are true.  Thus, the question presently before the Court is whether the Plaintiff has made sufficient allegations to support its anti-trust and state law claims.  KASP raises a number of claims of anti-trust behavior, including violations of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, as well as a violation of the Kentucky Anti-Trust Act and tortious interference with its business contracts.  Its complaints regarding the Defendants' conduct arise from a sample contract and the testimony of  a former employee.  Taken together, KASP argues that this evidence suggests that the Defendants offered dealers a reduced fee for auctioneering services so long as the dealers did not engage in business with the Plaintiff.  In a sense, KASP alleges that the Defendants entered into an "exclusive non-dealing" contract in an attempt to exclude it from the marketplace.

Although the Defendant's motion to dismiss asserts that KASP has failed to make allegations sufficient to support any of these claims, this case ultimately turns on three main issues: (1)  whether the Defendants' actions should be considered a "*per se*" violation under the Sherman Act or examined under a rule of reason analysis; (2)  assuming the Court applies a rule of reason analysis, has KASP sufficiently identified the relevant market; and (3)  has KASP properly alleged an injury to the marketplace, as opposed to itself.

While the Defendants' motion to dismiss the claims against ALLETE for lack of personal jurisdiction will be addressed separately, the Court will treat the Defendants as one entity in evaluating the anti-trust claims. As the Sixth Circuit noted in *Directory Sales Management Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606 (6th Cir. 1987):

> a parent cannot combine with its wholly-owned subsidiary for the purposes of section 1 [of the Sherman Act] because they are not separate enterprises. 467 U.S. at 768. Here we have two subsidiaries which are wholly-owned by the same parent and are likewise not separate enterprises. We agree with the Fifth Circuit that *Copperweld* precludes a finding that two wholly-owned sibling corporations can combine for the purposes of section.

*Id.*, at 611 (citations omitted).

## A.    Sherman Act § 1

Section 1 of the Sherman Act provides that "every contract . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §1. This section is intended to reach virtually every practice that may restrain competition, including horizontal and vertical price fixing and group boycotts. Section 1 has also been held to reach actions prohibited by the spirit of other anti-trust laws, but which fall outside the technical reach of those laws.[1] To sustain an allegation of concerted action in restraint of trade under Section 1, KASP must have alleged that: (1) two or more persons acting in concert (2) unreasonably (3) restrained trade or commerce (4) in

---

[1]    Section 3 of the Clayton Act prohibits tying arrangements that involve goods or products, but does not technically reach tying arrangements of personal services. These arrangements do, however, fall under Section 1 of the Sherman Act.

the relevant market (5) resulting in an anti-trust injury.  *Crane & Shovel Sales v. Bucyrus-Erie Co.*, 854 F.2d 802 (6th Cir. 1988).

The first element requires that two or more persons act in concert.  As noted above, parent and subsidiary corporations are considered a single entity for purposes of anti-trust analysis.  Therefore, an allegation that ADESA Lexington, ADESA and ALLETE conspired to exclude competition is insufficient.  *See, e.g., Directory Sales Management Corp.,* 833 F.2d at 611. However, KASP has also alleged the existence of contracts between ADESA Lexington and local dealers to unlawfully exclude it from the marketplace.  [Record No. 24, Ex. 6]  The allegation of involvement by outside auto dealers is sufficient to meet this first element under a Rule 12 analysis.

At this stage of the proceedings, the second and third elements are relatively straightforward.  These elements require only that a plaintiff plead that the actions of the defendants have restrained trade, and that a jury would consider that restraint unreasonable. Here, the Defendants do not seem to deny that KASP has cleared this fairly low hurdle.

The Defendants do maintain that KASP has failed to allege both a relevant market and an injury to competition beyond that which it allegedly suffered.  KASP responds that the Defendants' actions are so anti-competitive as to be considered *per se* violations, relieving it of the burden of pleading these elements.  Alternatively, it argues that it has pled both of these elements.

The question of whether a plaintiff need even pled elements (4) and (5) raises the first of the three issues which overarch this entire case (and indeed, most anti-trust cases).  This

analysis must begin with an examination of whether the alleged restraint is so inherently anti-competitive as to be evaluated under a *per se* rule or whether it must be considered under the rule of reason. *National Hockey League Players Assoc. (NHLPA) v. Plymouth Whalers Hockey Club*, 325 F.3d 712 (6th Cir. 2003). This evaluation is of primary concern here. If the Defendant's conduct is determined to be a *per se* restraint, it will relieve KASP of the burden of proving impact on the market. As a result, the Plaintiff would not be required to identify the relevant market nor would it have to show injury to competition. Further, the Defendants would be unable to justify their alleged practices under a reasonableness argument. *Id.*; *see also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998).

There is no definitive list of situations that offers instruction concerning when the *per se* rule should be applied. Notwithstanding this fact, citing *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958), the Sixth Circuit has given a general description of when a *per se* rule should apply:

> agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Foundation for Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 529 (6th Cir. 2001), citing *Northern Pac. Ry. Co.*, 356 U.S. 1, 5 (1958). In *Northern Pacific*, the Supreme Court also provided a non-exhaustive list of specific situations which qualify for the *per se* rule, including price fixing, division of markets, group boycotts

and tying arrangements.  *Id.*, citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 (1940); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, *aff'd*, 175 U.S. 211 (1899); *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457 (1941); *International Salt Co. v. United States*, 332 U.S. 392 (1947).

Here, the major difficulty is properly characterizing the alleged antitrust action. KASP complains of an exclusive dealing contract under which Defendant ADESA Lexington offers substantially discounted auctioneering services to auto dealers as long as those dealers agree to not do business with KASP.  Based on its allegations, KASP is actually asserting two different kinds of anti-trust violations: one by ADESA Lexington and another by the auto dealers who agree to the contract.  According to KASP, ADESA Lexington is inducing the auto dealers to participate in a semi-vertical group boycott of KASP, whereas the auto dealers are each agreeing to practice a unilateral refusal to deal with KASP.  Therefore, before the Court can determine whether to apply a *per se* or rule of reason analysis, it must first evaluate plaintiff KASP's claims of a unilateral refusal to deal.  Then, the Court must examine the alleged vertical group boycott as a separate matter.

### 1.      Refusal to Deal

The starting point for this analysis is the Supreme Court's *Colgate* doctrine.  *United States v. Colgate & Co.*, 250 U.S. 300 (1919).  The Colgate doctrine embodies two separate rules.  First, in the absence of purpose to create a monopoly, a party engaged in private

business has a discretionary right to deal with only those parties he or she so chooses.[2] Second, a party may announce in advance conditions under which he will refuse to sell even if those conditions might violate federal antitrust laws. *Id.*

Despite this general rule, courts have severely limited its application even though the Supreme Court has never explicitly overturned *Colgate*. For instance, to the extent that the actions of the auto dealers and ADESA Lexington are considered concerted action, a refusal to deal and a group boycott can be considered as one action, as the two terms are often employed interchangeably by federal courts. *See, e.g., E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.,* 467 F.2d 178 (5th Cir. 1972), *cert denied* 409 U.S. 1109 (1973). Moreover, specific concerted refusals to deal and/or group boycotts have been found to be *per se* violations of the Sherman Act where the principal target of that action was a competitor of one of the participants. *Eliason Corp. v. National Sanitation Foundation,* 614 F.2d 126, 129 (6th Cir. 1980); *see also Lewis v. Pennington*, 400 F.2d 806 (6th Cir.), *cert denied* 393 U.S. 983 (1968).

Further complicating this analysis is the general rule that anti-trust cases must be considered in their factual context. *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3rd Cir.), *cert denied* 400 U.S. 831 (1970); *Bridge Corp. of America v. American Contract Bridge League, Inc.*, 428 F.2d 1365 (9th Cir. 1970), *cert denied* 401 U.S. 940 (1971). It is the exact nature

---

2       This assumes an absence of any disallowed discriminatory purpose.

of the alleged contract between ADESA Lexington and the auto dealers that complicates this case.

KASP alleges that ADESA Lexington is offering the auto dealers a steep reduction in the price of its auctioneering service as long as the auto dealers agree that they will not do business with KASP – a direct competitor.  What is absent is any allegation that ADESA Lexington will refuse to do business with any auto dealer who continues using both ADESA Lexington and KASP.  It would appear that the auto dealer only forfeits the discounted price. However, if ADESA Lexington were to refuse to provide auctioneering services to dealers who wanted to continue doing business with KASP, this case would fit more neatly with those which hold that such a refusal is a violation of anti-trust laws.

As a way of understanding this distinction, consider the following hypothetical involving the fast food industry.  Suppose that in a particular marketplace, there are four primary fast food franchises: McDonald's, Burger King, Wendy's and Arby's.  Each offers substantially similar fare, and although McDonald's is dominant in terms of market power, it does not possess  monopoly power.  Next, assume that McDonald's offers its customers the following deal: it will give its customers a 50% discount on all purchases, provided those customers agree to not eat at Burger King.  In the event a customer wishes to continue to enjoy an occasional Whopper® from Burger King, he or she may also continue to dine at McDonald's, only without the discount.

From this perspective, the decision to eat only at McDonald's may make financial sense from the customer's point of view.  By eating only at McDonald's, his or her fast food

bills will be cut in half. However, those customers who prefer Whoppers® to the McDonald's discount may continue to do so at no penalty. To the extent any individual customer decides to discontinue eating at Burger King, it cannot be attributed to a conspiracy with McDonald's. Instead, the decision is based on the financial savings which is the result of his or her choice.

Under a similar scenario, a decision to do business only with ADESA Lexington makes financial sense. Assuming there is no readily identifiable difference in the quality of the auctioneering services, by doing business only with ADESA Lexington, the auto dealers receive a financial benefit. Further, there would be no intent to discriminate against KASP from their standpoint. Analyzed under the rule of reason, the auto dealers as customers have an eminently reasonable motivation to participate in the alleged restraint.

The analysis of the seller, however, is considerably more harsh. At this stage, the Court must assume KASP's allegations to be true. Looking to the above analogy, a reasonable explanation for McDonald's actions would be a desire to exclude Burger King from the marketplace. Similarly, a reasonable interpretation of ADESA Lexington's motivation would include a discriminatory one. Because ADESA Lexington is targeting only one competitor, the Court must determine if this single-competitor exclusion is the type of group boycott the anti-trust laws are intended to prevent.

### 2.    Group Boycott

KASP alleges that ADESA Lexington is inducing the auto dealers to participate in a vertical group boycott of KASP. ADESA Lexington and KASP are both in the business of

providing auto auction services, and both solicit business from auto dealers. This can be viewed as a quasi-distribution relationship that could constitute a vertical agreement between the Defendants and the auto dealers. If, therefore, the Defendants and some auto dealers have an agreement to exclude KASP, it would seem to qualify as a group boycott subject to *per se* treatment under the holding in *Savannah College*. 244 F.3d 521, 529 (6th Cir. 2001).

However, two issues prevent this analysis from ending here and, ultimately, prevent the Court from applying the *per se* rule. First, in *Fashion Originators*, the Supreme Court was faced with an exclusive distribution arrangement involving a manufacturer who refused to sell its clothes to retailers who sold similar garments produced by other companies. *Fashion Originators' Guild, Inc. v. FTC*, 312 U.S. 457 (1941). Second, in the years since *Fashion Originators* was decided, the Courts appear to have backed-off categorically subjecting all group boycotts to a *per se* analysis. Instead, they have distinguished horizontal and vertical group boycotts. *Crane & Shovel Sales,* 854 F.2d 802, 805 (6th Cir. 1988), citing *Com-Tel, Inc. v. Du Kane Corp.*, 669 F.2d 404 (6th Cir. 1982).

The Sixth Circuit has determined that, while horizontal group boycotts are normally considered *per se* violations of the Sherman Act, vertical group boycotts should be examined under the rule of reason. *Id.* at 409. In *Com-Tel*, the Sixth Circuit adopted the Second Circuit's approach in distinguishing between horizontal and vertical group boycotts.[3] *Id., citing Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946

---

[3]     Although the specific language refers to horizontal and vertical "restraints [of trade]", the term is used interchangeably with group boycotts as used in this Court's analysis.

(1978).  The Second Circuit reasons that horizontal group boycotts are "naked restraints of trade with no purpose except stifling competition" and, therefore, *per se* violations.  *Oreck*, 579 F.2d at 131, *citing White Motor Co. v. United States*, 372 U.S. 253 (1963).  However, because vertical group boycotts might promote certain efficiencies such as lower prices or more efficient distribution, such alleged restraints must be analyzed under the rule of reason. *Id.*, citing *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977).

### 3.    Injury to the Marketplace under the Rule of Reason Analysis

Having determined that both the auto dealers' refusal to deal and ADESA alleged, attempted vertical group boycott should be examined under a rule of reason analysis, the examination of KASP's claims must return to the fourth and fifth elements of a Sherman Act claim.  As previously noted, to properly allege a violation of the Sherman Act, KASP must have sufficiently alleged that the Defendants restrained trade "in the relevant market" and that "an anti-trust injury" has resulted.

Generally speaking, "market definition is a highly fact-based analysis that [] requires discovery." *Savannah College*, 244 F.3d at 531, citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992).  "The identification of market power is . . . the first step in any rule of reason claim under section 1".  *Eastern Food Services, Inc. v. Pontifical Catholic Univ. Services*, 357 F.3d 1 (7th Cir. 2004); *U.S. v. Visa, U.S.A., Inc.*, 344 F.3d 229 (2nd Cir. 2003).  At a minimum, a plaintiff must allege the market in which the defendant is having an adverse effect on competition.  *Hand v. Central Transport, Inc.*, 779 F.2d 8 (6th Cir. 1985).

While this requirement is a minimal one, KASP has barely satisfied it here. KASP alleges a relevant marketplace encompassing the entire Commonwealth of Kentucky. [Record No. 18, ¶8] Further, it alleges that ADESA Lexington is the largest auto auction in Central Kentucky. *Id.* at ¶11. Although this allegation of a market ignores obvious questions regarding whether Lexington, Louisville, Bowling Green and Covington should be considered as one market, KASP has alleged an impact on a marketplace of "Central Kentucky" which would encompass consumers of automobiles from auctions in the Lexington area (allegedly, ADESA Lexington is the a dominant market power in this area).

More troubling is the issue concerning whether KASP has made sufficient allegations regarding the existence of an anti-trust injury. To survive a motion to dismiss, KASP must do more than allege that it suffered injuries as a result of defendants' actions – it must allege those actions harmed competition in the marketplace. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328 (1990). "The welfare of a particular competitor who may be hurt as the result of some trade practice is [not] the concern . . . of the federal antitrust laws." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 394 (7th Cir. 1984), *citing Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

The Seventh Circuit has established a two-part test to evaluate exclusive-dealing allegations where the plaintiff alleges that its personal harm is also harm to the marketplace. In *Roland Machinery*, the court required that the plaintiff prove that the likely effect of the agreement was to keep "at least one significant competitor of the defendant from doing business in the relevant market." *Id.* In addition, the plaintiff must prove that the "probable

-14-

(not certain) effect of the exclusion will be to raise prices above [] the competitive level, or otherwise injure competition." *Id.* In short, the plaintiff must prove that the "anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it." *Id.*

Because the Court is not considering this matter under Rule 56, the Plaintiff must only allege – rather than prove – this exclusion and resulting harm. Again, KASP *barely* carries this burden. Although KASP incorrectly relies upon its own damages in attempting to establish an anti-trust injury [Record No. 18, ¶¶ 18, 20-27], it does implicitly allege that defendants are attempting to "destroy[] competition." *Id.* at ¶14, 16.

At a later stage in this litigation, it may be impossible for KASP to establish an anti-trust injury without establishing something more than its own injuries. As the analysis in *Roland Machinery* points out, it is unclear why a consumer would aid a supplier in reducing competition when the probable effect would be higher prices for the consumer. Thus, the question in this anti-trust action is not whether ADESA Lexington was deliberately trying to exclude KASP. Anti-trust laws are concerned with protecting consumer interests in competition, not in protecting competitors from each other. *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).

In summary, with respect to the Defendants' motion to dismiss KASP's allegations under Section 1 of the Sherman Act, the Court concludes that KASP has alleged that ADESA Lexington, as the dominant player in the Central Kentucky auto auction market, is attempting to exclude its main competitor from that marketplace, and that exclusion would injure

competition in the auto auction market. This allegation is barely sufficient to allow this claim to proceed to discovery.

### B.   Sherman Act § 2

As broad as the application of Section 1 of the Sherman Act might be, Section 2 is even more far-reaching. *Standard Oil Co. v. United States*, 221 U.S. 1 (1911). Section 2 does not proscribe the simple possession of monopoly power; sometimes monopoly power may be acquired because of superior business skill. *United States v. Grinnell*, 385 U.S. 563 (1966). Instead, Section 2 is meant to prevent the purpose or intent to exercise monopoly power, either by raising prices or excluding competition. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992). To prevent the exercise of that monopoly power, Section 2 also prohibits an "attempt to monopolize, or combine or conspire . . . to monopolize any part of [interstate] trade." 15 U.S.C. § 2. Therefore, to the extent that the Defendants argue that KASP must prove actual possession of monopoly power coupled with the necessary intent to exercise, that contention is incorrect. [Record No. 21, pp. 11-12] The Defendant seems to recognize as much, and argues that KASP has also failed to allege a claim for attempted monopolization.

To defeat a motion to dismiss, a claim for attempted monopolization requires that a plaintiff allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly

power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).[4]  ADESA Lexington

argues that KASP has failed properly allege any of these elements.  Before addressing the

first and third elements, the Court notes that despite this contention, the Defendants fail to

offer an argument regarding how the allegations on the second element – a specific intent to

monopolize – are deficient.  Given the example of the attached contract and testimony

regarding the Defendants' intent to allegedly exclude its largest competitor, this element has

been sufficiently alleged.

      As to the element of predatory or anticompetitive behavior, the Defendants argue that

exclusive deal which lowered certain prices to certain potential customers is not actionable

predatory pricing.  Relying on *Fieldturf v. Southwest Recreational Indus., Inc.*, 235 F. Supp

2d 708 (E.D.Ky. 2002), the Defendants argue that predatory pricing is only actionable when

products are priced below their cost of production for the purpose of driving out competitors

and allowing a subsequent increase in prices.  [Record No. 21, pp. 12-13]  This, however, is

not the exact standard for determining predatory pricing.

      The Court is mindful of the Sixth Circuit's recent decision in *Spirit Airlines, Inc. v.

Northwest Airlines, Inc.*, 429 F.3d 190 (6th Cir. 2005).  There, the court reaffirmed that a

"plaintiff seeking to establish competitive injury resulting from a rival's low prices must

prove that the prices complained of are below an appropriate measure of its rival's costs."

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).

---

4      Defendants also argue that KASP has failed to allege a market in which the attempted monopolization
took place.  The Court has already addressed this argument.  *See* subsection (A)(3) *supra*.

However, the court also reaffirmed its reliance on *William Inglis v. ITT Continental Baking Co.*, in which the Ninth Circuit found that in certain situations, "a firm selling above average variable costs could be guilty of predation." *Spirit Airlines*, 429 F.3d at 211, *citing Inglis*, 668 F.2d 1014, 1035 (9th Cir. 1981). Consequently, the Sixth Circuit announced a more nuanced test for judging predatory pricing:

> We hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power.

*Spirit Airlines*, 429 F.3d at 211.

In the present case, KASP has alleged that ADESA Lexington has made contracts, "that state in return for a lower fee or no fee charged at all to the dealer, the dealer would not give any business to KASP, Inc." [Record No. 18, ¶21] Even assuming that a fee of $0 is not below ADESA Lexington's variable cost of production, this seems designed to eliminate competition. In *Spirit Airlines* the Sixth Circuit determined, despite the fact that Northwest priced its flights above its average cost, it did so because it knew it would be able to recoup its lost profits following Spirit's exit from the market. *Id.* at 212. Taking KASP's allegations as true, there is a sufficient basis to sustain a claim of predatory pricing.

A plaintiff must also allege a dangerous probability of achieving monopoly power. This requires the plaintiff to allege both a relevant market and the defendants' market power. As noted above, KASP has sufficiently alleged both the market in question and ADESA

-18-

Lexington's status as the dominant player in that market.  *See* subsection (A)(3), *supra*.  At this stage of the pleadings, this is sufficient to survive a motion to dismiss.

### C.     Clayton Act § 3

KASP, however, cannot sustain a claim under section 3 of the Clayton Act.  In order to sustain a claim under this section, the contract must be for the "sale of goods, wares, merchandise, machinery, supplies, or other commodities . . ."  15 U.S.C. § 14.  "Section 3 of the Clayton Act does not apply if either the tying product or the tied product is a service." *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 836 (6th Cir. 2004), citing *Chelson v. Oregonian Publ'g Co.*, 715 F.2d 1368, 1372 (9th Cir. 1983); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1141 (8th Cir. 1981), *cert. denied*, 457 U.S. 1111 (1982).  The contracts which KASP alleges to be in violation of the Clayton Act are for the provision of auctioneering services.  As a provision of a service, these contracts are outside the scope of the Clayton Act.  *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 358 (4th Cir. 1983)

KASP attempts to save this claim by arguing that it, as part of its auctioneering services, "actually purchases and sells vehicles in addition to consignment and being an auctioneer."  [Record No. 24, p. 14]  However, as the Defendant correctly notes, it is irrelevant that the Plaintiff deals in good or services.  The only relevant inquiry is whether the allegedly illegal activities of Defendants involve a sale of goods.  Even assuming that KASP meant to allege that ADESA Lexington occassionally obtained title to the vehicles as

part of a consignment agreement, the test under Section 3 of the Clayton Act is one of the dominant nature of the transaction. *Continental Cablevision*, 714 F.2d 351. Here, the dominant nature of the subject contracts is clearly for the provision of auctioneering services. Thus, KASP cannot sustain a claim under Section 3 of the Clayton Act.

### D.   Kentucky Anti-trust Act

The Kentucky Consumer Protection Act is virtually identical to the Sherman Antitrust Act. If a plaintiff cannot establish a conspiracy necessary to support a restraint of trade claim under § 1 of the Sherman Act, the defendant would also be entitled to a dismissal on the Kentucky Consumer Protection Act (KPCA) claim. *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495 (E.D. Ky. 1996), *aff'd*, 156 F.3d 1228 (6th Cir. 1998). Conversely, where a plaintiff can establish a claim under the Sherman Act, it has also established a claim under the KCPA absent other circumstances.

The Defendant allege that KASP lacks standing to pursue this state law claim. It asserts that Chapter 367 of the Kentucky Revised Statutes was intended to provide protection to consumers. [Record No. 21, p. 19], *citing Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.,* 836 S.W.2d 907 (Ky. App. 1992). Because the provisions of the act were "intended to provide civil remedies only to consumers," KASP is not of the class of entities protected, and does not have standing to challenge the contracts. *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998).

In *Borg-Warner*, the court found the Kentucky statute to have been interpreted similarly to the federal statute. 946 F. Supp. at 500. Neither that court, nor this one, can find

-20-

any cases identifying a standing restriction in the Kentucky statute (one which both parties would agree does not exist in the federal statute).  KASP is correct that the cases cited by that court merely suggest that KRS 367.175 was only intended to provide a remedy to consumers. Moreover, in *Kentucky Laborers, id.,* the district court for the Western District of Kentucky points out that recovery, even if not explicitly allowed by the KCPA, may still be possible under K.R.S. 446.070.  24 F. Supp. 2d at 773.

Having established a claim under Sections 1 and 2 of the Sherman Act, the Plaintiff will be allowed to proceed on his state law claims under the KCPA.

### E.   Tortious Interference

In identifying the elements of a claim for tortious interference, Kentucky has adopted the Restatement (Second) of Torts § 766B, Intentional Interference with Prospective Contractual Relation (1979):

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

*Cullen v. South East Coal Co.*, 685 S.W.2d 187, 189-190 (Ky. App. 1983).

The Sixth Circuit has expressed approval this test, holding that the key factor is whether the interference is considered "improper." *Stratmore v. Goodbody*, 866 F.2d 189, 195 (6th Cir. 1989).  Unfortunately, there is no bright-line rule as to what constitutes a proper versus improper interference.  Instead, the determination is based on the factual situation and

-21-

motives of the parties.  With that in mind, the Court believes that KASP's allegations that the Defendants are motivated by a desire to suppress competition in violation of anti-trust law are sufficient allegations of "improper" interference.  [Record No. 18, ¶27]

### F.    Lack of Personal Jurisdiction as to ALLETE

KASP has the burden of establishing personal jurisdiction.  *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980).  KASP argues that its allegations as to ALLETE are sufficient to establish jurisdiction.  It has asserted that:

> [ALLETE] authorized deals in Kentucky, audited ADESA Lexington regularly, profited from ADESA Lexington and [an officer of ALLETE] participated in various decisions related to the market in Kentucky.

[Record No. 24, pp. 17-18]

Notwitstanding the Plaintiff's arguments, a parent company's amenability to jurisdiction is not based on the local activities of a subsidiary.  *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292, 297 (6th Cir.1964).  Rather, the question is whether the parent itself has the minimum contacts with the state.  *Id.*  Ownership of the subsidiary is considered one contact in the analysis.  However, it is not sufficient standing alone to confer personal jurisdiction question.  *Id., see also Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279 (6th Cir.1990).  A plaintiff must allege that the parent did something itself.  *Bradley v. Mayo Foundation*, 1999 U.S. Dist. LEXIS 17505 (E.D.Ky.1999).

The allegations in KASP's Amended Complaint are all allegations of wrongdoing by ADESA Lexington or ADESA.  There are no allegations that ALLETE has engaged in any separate corporate business activities in Kentucky beyond the management of its subsidiary

in keeping its books or profiting from ownership.   The Court is persuaded by the analysis in *Martin v. Southern Indiana Treatment Center, Inc.*, in which the companies in question had a similar legal relationship to ALLETE and ADESA.  2004 U.S. Dist. LEXIS 15293 (W.D.Ky. 2004).   The court dismissed based on personal jurisdiction, despite an intermingling of corporate officers, provision of corporate materials, and legal monitoring.

The Court is also aware of the Sixth Circuit's holding in *Third National Bank in Nashville v. Wedge Group Inc.*, 882 F.2d 1087 (6th Cir.1989).  There, the court found a sufficient basis for personal jurisdiction based on, among other factors, the parent's direct involvement in contract disputes and execution of separate contracts with in-state parties. *Id.* at 1090.  However, the relationship between ALLETE and ADESA is more similar to the parties in *Martin* than to those in *Third National Bank*.  As such, the Court concludes that KASP's allegations are insufficient to meet the requirements of Kentucky's long-arm statute. K.R.S. 454.210.

## IV.    CONCLUSION

For the reasons discussed above, it is hereby **ORDERED** as follows:

(1)    The Defendants' motion for summary judgment [Record No. 21] is **GRANTED** with respect to the claims under Section 3 of the Clayton Act and personal jurisdiction over ALLETE, Inc.  The Defendants' motion is **DENIED** with respect to all other counts;

(2)    Defendant ALLETE, Inc. is **DISMISSED** as a party to this action.

This 17th day of February, 2006.

-23-



Signed By:

*Danny C. Reeves* DCR

**United States District Judge**